1
2
3
4
5
6
7
8
9          **UNITED STATES DISTRICT COURT**

10         **SOUTHERN DISTRICT OF CALIFORNIA**

11

12   SHAWN MURRAY,                           Case No. 08cv2121 BTM(AJB)

13                          Plaintiff,       **ORDER GRANTING DEFENDANTS'**
                                             **MOTION FOR PARTIAL SUMMARY**
14         v.                                **JUDGMENT ON FALSE ARREST**
                                             **CLAIM**
15   CITY OF CARLSBAD, MARK RENO,
     DZUNG LUC, DOMINGO PARRA,
16   DEREK HARVEY and GILBERT
     BEASON
17                         Defendants.

18

19         Defendants Lieutenant Marc Reno ("Reno"), Officer Dzung Luc ("Luc"), and the City

20   of Carlsbad ("City") have filed a motion for summary judgment on Plaintiff Shawn Murray's

21   ("Plaintiff" or "Murray") 42 U.S.C. § 1983 claim for false arrest.  For the reasons discussed

22   below, Defendants' motion is **GRANTED**.

23

24                              **I.  BACKGROUND**

25   **A.  Facts Surrounding Plaintiff's Arrest**

26         On August 18, 2009, six Carlsbad police officers responded to a call of domestic

27   violence at the address of Plaintiff, an Oceanside Police Department Lieutenant.  (Third Am.

28   Compl. ("TAC") ¶ 13.)  The officers responding to the call were Reno, Luc, Sergeant Gilbert

1   Beason ("Beason"), Officer Domingo Parra ("Parra"), Officer Derek Harvey ("Harvey"), and

2   Detective Eric Prior ("Prior").  (TAC ¶ 14.)

3        Luc was the first officer to arrive at the scene.  (Luc Dep. (Def's Ex. D) 49:10-11)

4   When Luc arrived, Shande Carpenter ("Carpenter"), a former Carlsbad Police Department

5   officer, was in the front yard of Plaintiff's residence and "[s]he appeared upset, nervous . .

6   . distraught as a victim."  (Luc Dep.  58:12-18.)  Carpenter explained that Plaintiff was her

7   ex-boyfriend and that she had come to his house to retrieve some of her belongings.  (Luc

8   Dep. 109:15-23.)  Carpenter told Luc that when she was in the house, she got into a physical

9   altercation with Plaintiff during which Plaintiff choked her and pushed her up against the wall

10   by her neck.  (Luc Dep. 58:21-59:1.)  Carpenter told Luc that Plaintiff then threw her to the

11   ground, dragged her through the house, and threw her out the front door.  (Luc Dep. 59:1-6.)

12   Luc observed that Carpenter had "a visible mark, essentially redness around her neck" that

13   was "consistent with her being choked or . . . grabbed around the neck."  (Luc Dep. 225:6-

14   15.)  Luc also noticed a visible injury on her left arm.  (Luc Dep. 225:3-5; Beason Dep. (Pl.'s

15   Ex. 6) 135:2-5.)

16        When Reno arrived at the scene, Reno questioned Carpenter.  (Reno Dep. (Pl.'s Ex.

17   2) 206:21-25.)  Carpenter told Reno that she was inside the house when Plaintiff became

18   physically violent, choked her, dragged her through the house, and threw her on the front

19   stoop.  (Reno Dep. 206:1-9)  Carpenter described how she went to Plaintiff's truck after

20   being ejected from Plaintiff's house, was involved in an altercation with Plaintiff at the truck,

21   went back to Plaintiff's house, and had another altercation with Plaintiff in his house.  (Reno

22   Dep. 206:10-13.) After hearing Carpenter's story, Reno called Plaintiff on his cell phone, and

23   Plaintiff invited the officers into his house.  (Reno Dep. 206:14-20.)

24        Luc, Reno, Beason, Parra, and Harvey entered Plaintiff's home and stood in the

25   kitchen as Plaintiff explained what happened.  (Luc Dep. 247:25-248:4.)  Luc estimates that

26   Plaintiff talked for approximately thirty minutes.  (Luc Dep. 247:23-24.)  Plaintiff told Luc that

27   Carpenter had texted him about coming over to his house, and that he texted back telling

28   her not to come.  (Luc Dep. 167:23-168:11.)  Plaintiff explained that he allowed Carpenter

08cv2121 BTM(AJB)

into his house for the limited purpose of retrieving cards, letters, and a pair of pants. (Murray Decl. ¶ 5.j.) Carpenter refused to leave for two hours despite Plaintiff's repeated requests that she do so. (Murray Decl. ¶ 5.k.) Plaintiff told the officers that he "walked Carpenter out" of his residence. (Murray Decl. ¶ 5.m.) Unbeknownst to Plaintiff, Carpenter had taken Plaintiff's truck keys and began rummaging through his truck. (Murray Decl. ¶¶ 5.n-5.p.) Carpenter refused to leave the truck, and Plaintiff physically removed her. (Murray Decl. ¶ 5.q.) Plaintiff ran back to his house, and Carpenter followed. (Murray Decl. ¶¶ 5.r-5.s.) Plaintiff attempted to close the door, but Carpenter stuck her arm and foot in the door to stop Plaintiff from shutting it. (Murray Decl. ¶ 5.s.) Plaintiff told the officers that "Carpenter forced her way into the house and I removed her." (Murray Decl. ¶ 5.t.) Reno asked Plaintiff where the confrontation occurred, and Plaintiff answered that it occurred at the truck, the door, and near the kitchen. (Murray Decl. ¶ 8.) Reno told Plaintiff, "That's inconsistent," and left the house. (Murray Decl. ¶ 9.) Plaintiff became suspicious that the officers deemed him to be the primary aggressor in the domestic violence, and the officers in the kitchen confirmed that this was so. (Murray Decl. ¶¶ 10-11.)

Luc considered the red mark on Carpenter's neck to be inconsistent with reasonable force used to eject a trespasser. (Luc Dep. 90:3-91:6.) Based on Carpenter's visible injuries and his determination that Carpenter's explanation of events (the choking) was more consistent with those injuries than Plaintiff's explanation of events, Luc arrested Plaintiff for violating Cal. Penal Code § 273.5, felony domestic violence. (Luc Dep. 256:25-258:6.)

Luc called to acquire an Emergency Protective Order ("EPO") for Carpenter, even though as a non-cohabitating non-family member she did not qualify for one. (Luc Dep. 24:10-25:16.) Luc also attempted to get an EPO for Plaintiff after Plaintiff asked Luc for one. (Luc Dep. 25:17-22.) The District Attorney's Office declined to file criminal charges against Plaintiff. (Pl.'s Ex. 8.)

**B. <u>Policy Governing Domestic Violence Arrests</u>**

California Penal Code § 13701 mandates that "every law enforcement agency in this

3

state shall develop, adopt and implement written policies and standards for officers' responses to domestic violence calls by Januanry 1, 1986.  These policies shall reflect that domestic violence is alleged criminal conduct . . ."  Section 13701 further explains that:

> The written policies shall encourage the arrest of domestic violence offenders if there is probable cause that an offense has been committed.  These policies also shall require the arrest of an offender, absent exigent circumstances, if there is probable cause that a protective order . . . has been violated.  These policies shall discourage, when appropriate, but not prohibit, dual arrests. Peace officers shall make reasonable efforts to identify the dominant aggressor in any incident.  The dominant aggressor is the person determined to be the most significant, rather than the first, aggressor.  In identifying the dominant aggressor, an officer shall consider the intent of the law to protect victims of domestic violence from continuing abuse, the threats creating fear of physical injury, the history of domestic violence between persons involved, and whether each person acted in self defense.

Carlsbad Police Department, Policy 320 ("Policy 320") was adopted in response to the California state legislature's passage of Cal. Penal Code §§ 13701(a) and (b), "mandating the preparation and adoption of a domestic violence law enforcement protocol in each law enforcement agency in the state."  ("Policy 320" (Def.'s Ex. 1 to Reno Dep.), Section 320.1.)  Cal. Penal Code § 13701 and Policy 320 advance a pro-arrest policy regarding domestic violence.  (Policy 320, Section 320.11.)  Policy 320 states, "Law enforcement officers shall arrest batterers in all situations where an arrest is legally permissible for felony acts of domestic violence and should arrest batterers for misdemeanor acts of domestic violence."  (Policy 320, Section 320.11(d).)  This means that once the primary aggressor is identified and there is probable cause for an arrest for domestic violence, the officer should arrest the primary aggressor.  (Reno Dep. 26:2-16.)

According to Policy 320, in the context of domestic violence, the primary aggressor "is the person who is the most significant, rather than the first, aggressor."  (Policy 320, Section 320.12(o).)  The primary aggressor is often determined by the extent of injury to the parties at the scene.  (Reno Dep. 25:1-19.)

For officer-involved domestic violence cases, there should be review by an officer one rank above the rank of the officer involved.  (Policy 320, Section 320.66(a)(1).)

///

4

## II.  LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).  A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party.  Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proving at trial.  Id. at 322-23.

Once the moving party establishes the absence of genuine issues of material fact, the burden shifts to the nonmoving party to set forth facts showing that a genuine issue of disputed fact remains.  Celotex, 477 U.S. at 314.  The nonmoving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." Anderson, 477 U.S. at 256.  When ruling on a summary judgment motion, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party.   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III.  DISCUSSION

In a motion filed by Reno and the City on April 2, 2010, and joined by Luc on July 12, 2010, Defendants seek partial summary judgment on the false arrest claim.  For the reasons discussed below, Defendants' motion is granted.

## A. <u>Probable Cause</u>

Plaintiff asserts that Luc lacked probable cause to arrest him for violating Cal. Penal Code § 273.5.  The Court disagrees.  As discussed below, the undisputed facts in this case establish that Plaintiff's arrest was supported by probable cause.

### 1. <u>Probable Cause Standard</u>

A warrantless arrest must be supported by probable cause.  "Probable cause exists when, under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime."  <u>Peng v. Mei Chin Penghu</u>, 335 F.3d 970, 976 (9th Cir. 2003).  An undisputed and detailed statement from a victim can be enough to find probable cause: "A sufficient basis of knowledge is established if the victim provides facts sufficiently detailed to cause a reasonable person to believe that a crime has been committed and the named suspect was the perpetrator."  <u>Id.</u> at 978 (internal quotation marks and citations omitted).  Even if there is a factual dispute concerning the victim's allegations, probable cause is not necessarily defeated: "The presence of a factual dispute regarding a victim's complaint at the scene of an alleged domestic disturbance does not defeat probable cause if: 1) the victim's statements are sufficiently definite to establish that a crime has been committed; and 2) the victim's complaint is corroborated by either the surrounding circumstances *or* other witnesses."  <u>Id.</u> at 979 (emphasis added).

### 2. <u>Cal. Penal Code § 273.5</u>

According to Cal. Penal Code, "Any person who willfully inflicts upon a person who is his . . . former cohabitant . . . corporal injury resulting in a traumatic condition, is guilty of a felony."  The statute explains, "As used in this section, 'traumatic condition' means a condition of the body, such as a wound or external or internal injury, whether of a minor or serious nature, caused by a physical force."

### 3. Luc's Probable Cause Determination

Officer Luc's probable cause determination was supported by a sufficiently detailed statement by Carpenter in addition to corroborating circumstances.

Officer Luc took detailed statements from both Carpenter, the alleged victim, and Plaintiff, the accused.  Carpenter told Luc that when she was in the house with Plaintiff, they got into a physical altercation during which Plaintiff pushed Carpenter up against the wall and choked her, then threw her on the ground.  (Luc Dep. 58:21-59:2.)  Carpenter also told Luc that Plaintiff dragged her through the house and threw her out the front door.  (Luc Dep. 59:3-6.)  Carpenter explained that she did have injuries but did not need medical attention. (Luc. Dep. 63:23-25.)

Plaintiff told the officers how he ejected Carpenter from his house two times ("walking" her out the first time and "removing" her the second time) and ejected her from the car by physically pulling her out.   (Murray Decl. ¶ 5.)  Plaintiff did not mention choking Carpenter at any time and did not provide any detail regarding what physical force he used during the physical ejections.

Carpenter's statement was sufficiently detailed to support a finding of probable cause. See Peng, 335 F.3d at 978 (statement from victim that documents had been taken from her forcefully supported probable cause for arrest).  Carpenter recited specific facts regarding how Plaintiff choked her and threw her down on the ground, acts that clearly qualify as willful infliction of corporal injury.  Carpenter also told Luc that she sustained injuries, which Luc saw, as a result of Plaintiff's actions.

There was arguably a factual dispute regarding Carpenter's claim that Plaintiff choked her because Plaintiff never mentioned to the officers that he grabbed Carpenter by the neck or choked her (although he never specifically denied that he choked Carpenter either). Therefore, in addition to the definiteness of Carpenter's statements, the Court looks to whether Carpenter's claims were corroborated by either the surrounding circumstances or other witnesses.   Peng, 335 F.3d at 979.  In this case, there were no third-party witnesses. However, there were surrounding circumstances that corroborated Carpenter's story.

When Officer Luc arrived on the scene, Carpenter "appeared upset, nervous . . . distraught as a victim," which was consistent with the other domestic violence scenes that Luc had responded to in the past.  (Luc Dep.  58:12-18.)  An individual's demeanor *alone* cannot support probable cause.  <u>United States v. Rubalcava-Montoya</u>, 597 F.2d 140, 142 (9th Cir. 1978).  "Yet, it is settled law that officers may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.' " <u>Hart v. Parks</u>, 450 F.3d 1059, 1067 (9th Cir. 2006) (quoting <u>United States v. Hernandez</u>, 313 F.3d 1206, 1210 (9th Cir.2002)).  Thus, Luc properly considered Carpenter's demeanor as corroboration for her statement.

Furthermore, Carpenter's statement was corroborated by the injuries to her arm and neck that Luc saw.  Luc observed redness around Carpenter's neck in addition to an injury on her left arm.  (Luc. Dep. 225:3-5, 6-15.)  Plaintiff provided no specific explanation for Carpenter's neck injury.  <u>Cf.</u> <u>Pinckney v. City of San Jose</u>, No. C-08-04485, 2010 WL 94266, at *4 (N.D. Cal. Jan. 6, 2010) (finding probable cause based on victim's allegations of domestic violence and bruises on her legs, *despite* explanation by husband that did not involve domestic abuse and was consistent with injuries and *despite* recanting of allegations by victim).

Based on the detailed statement from Carpenter and corroboration by surrounding circumstances, Luc had probable cause to arrest Plaintiff for domestic violence.


4.  <u>Adequacy of Surrounding Circumstances</u>

Plaintiff argues that there are triable issues of fact regarding the surrounding circumstances used to corroborate Carpenter's story.  Mainly, Plaintiff disputes the presence and severity of the injury to Carpenter's neck.  Plaintiff points out that Parra and Beason did not make observations similar to Luc.  Beason noticed Carpenter had "slight redness" on her neck but wasn't sure if it was an injury or if she was "normally that color."  (Beason Dep. (Pl.'s Exs. 6, 7) 135:8-10.)  Parra did not see any injuries on Carpenter.  (Parra Dep. (Pl.'s

08cv2121 BTM(AJB)

1   Ex. 5) 164:15-17.)

2       The fact that Beason and Parra did not see the neck injury, or that they could not

3   definitively identify any coloration as an injury, does not contradict the observations of Officer

4   Luc.  Beason and Parra did not claim that they examined Carpenter's neck and came to a

5   conclusion contrary to that reached by Luc.  Beason asserts that he was merely "just nearby"

6   as Luc spoke to Carpenter.  (Beason Dep. 135:18-22.)  Furthermore, Beason actually saw

7   redness that could be consistent with injury.  Parra spoke to Carpenter, but he clearly did not

8   examine her neck.  (Parra Dep. 164:15-165:3.)  At his deposition, Parra initially said that he

9   did not see Carpenter's neck.  (Parra Dep. 164:22.)  Then he said that he "probably" saw her

10  neck and "guess[es]" that one could say that he did not notice anything that led him to

11  believe that her neck had been injured.  (Parra Dep. 165:4-12.)  Parra's failure to notice

12  redness or anything else about Carpenter's neck does not mean that Luc did not observe

13  the redness.

14      Plaintiff also relies on photographs taken at the scene by Officer Harvey (Ex. 9 to Pl.'s

15  Opp'n Br.), which Plaintiff claims do not show any injury to Carpenter's neck.  (Pl.'s Opp'n

16  Br. 13:12-13.)  Plaintiff never actually claims that there were *no* injuries to Carpenter's neck,

17  but merely argues that the photographs are not consistent with Luc's observations.  (Id. at

18  13:10-14:22.)  According to Luc, however, the photographs taken by Officer Harvey do not

19  accurately  reflect  the  injury  that  he  observed  and  considered  for  his  probable  cause

20  determination.  (Luc Dep. 226:18-227:11.)[1]  Therefore, the photographs do not create an

21  issue of material fact regarding probable cause.

22      Plaintiff  makes  the  additional  argument  that  any  injuries  Carpenter  might  have

23  sustained are insufficient to support an arrest under Cal. Penal Code § 273.5.  The statute

24  _____

25      [1] It is unclear how soon after Luc made his observations that Harvey took the pictures.
    Moreover, upon review of the photographs, the Court cannot conclude whether there was
26  redness on Carpenter's neck or not.  Various factors such as lighting, contrast, and
    resolution affect the appearance of a photograph.  The Court notes that Jack Smith,
27  Plaintiff's expert witness, claims that the photograph of Carpenter's face and neck "does not
    show any injury whatsoever." (Smith Decl. ¶ 29.)  Smith's interpretation of the photograph
28  does not constitute evidence regarding the existence or extent of Carpenter's neck injury.

08cv2121 BTM(AJB)

requires that the perpetrator willfully inflict "corporal injury resulting in a traumatic condition" to be guilty of a felony.  The statute gives some guidance as to this requirement, explaining that a traumatic condition "means a condition of the body, such a wound or external or internal injury, whether of a minor or serious nature, caused by physical force."  Id.  Plaintiff contends that Carpenter suffered nothing more than "soreness and tenderness," which is insufficient to constitute a traumatic condition under § 273.5.  People v. Abrego, 21 Cal. App. 4th 133, 138 (1993).  However, it has been held that a red mark, much like the one Luc observed on Carpenter's neck, is sufficient to constitute a traumatic condition under § 273.5.  See People v. Wilkins, 14 Cal. App. 4th 761, 771 (1993) (probable cause found for § 273.5 arrest when officer observed "redness about [the victim's] face and nose" because "section 273.5 is violated when the defendant inflicts even 'minor' injury"); Harrington v. City of Napa, 2005 WL 1656883, at * 6 (N.D. Cal. 2005) (redness on skin where victim was allegedly hit with a telephone met definition of "traumatic condition").

Plaintiff also challenges the overall reasonableness of the officers on the scene, questioning their ability to be objective due to their personal and professional relationships with Carpenter.  In fact, the one officer on the scene without a history with Carpenter was Luc, the arresting officer.  (Pl.'s Opp'n Br. 9:4-5.).  There is no evidence that any personal bias influenced his decision to arrest Plaintiff.  Moreover, the other officers described a professional history with Carpenter that gave them a reason to trust her.  (Parra Dep. 25:16-24.)  The officers' knowledge of Carpenter's character arguably gave them grounds to give more weight to Carpenter's claims.  See People v. Ramey, 16 Cal. 3d 263, 267 (1976) (holding that working relationship between police and private investigator gave private investigator's statements additional reliability).  Therefore, the Court rejects Plaintiff's claim that all of the officers' actions were tainted because some of them had preexisting relationships with Carpenter.

### 5.  Plaintiff's Right to Eject a Trespasser

Plaintiff correctly observes that reasonable force may be used to eject a trespasser.

People v. Cortlett, 67 Cal. App. 2d 33, 52 (1944) (disapproved on other grounds in People v. Carmen, 36 Cal. 2d 768 (1951)); Cal. Jury Instr. Crim. 5.40.  In the context of defense of property, reasonable force is defined as force that "is limited by what would appear to a reasonable person, under the existing circumstances, to be necessary to prevent damage to the property."  Cal Jury Instr. Crim. 5.40.

Plaintiff argues that Luc failed to consider that Plaintiff was ejecting a trespasser, giving rise to a defense in connection with any injuries sustained by Carpenter.  This argument is unpersuasive for several reasons.  According to the evidence, Luc listened to Plaintiff's statement for half an hour.  Plaintiff did not provide any detail regarding what physical force he used to remove Carpenter from his truck and to eject her from his house the second time.  Therefore, Plaintiff's statements do not establish that Carpenter's neck injury was the result of reasonable force used to eject a trespasser.[2]  At any rate, Officer Luc reasonably concluded that Carpenter's neck injury and her description of the encounter were inconsistent with reasonable force.  (Luc Dep. 299:5-21.)  Carpenter's account of Plaintiff grabbing her by the neck and pushing her against the wall describes force more consistent with gratuitous violence than with force necessary for the removal of a former girlfriend who is trespassing.[3]

Plaintiff also contends that Luc failed to adequately investigate Plaintiff's claims regarding the incident.  The Court rejects this contention.  By listening to Plaintiff's side of

---

[2] Carpenter told Reno that Plaintiff choked her when she was in the house prior to the first ejection.  According to Plaintiff, he just "walked" Carpenter out the first time.  Therefore, any choking would not have occurred during the process of ejecting her.

[3] Plaintiff notes that the Deputy District Attorney declined to file charges because "the amount of force . . . appears to be reasonable."  (Pl.'s Ex. 8.)  Such a determination has no impact on the initial probable cause determination of Officer Luc, because probable cause only requires a fair probability that a crime has been committed, while a DA must prove guilt beyond a reasonable doubt.  The Supreme Court has noted that this marked difference is "obvious," and that "prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt."  United States v. Lovasco, 431 U.S. 783, 791 (1977) (internal quotation marks omitted).  In this case, the Deputy District Attorney later explained that while he declined to file charges against Plaintiff, the arrest was supported by the evidence: "Furthermore, had an arrest NOT been made on these facts, the officers would have been derelict in their duties, as all the elements of the PC 273.5 crime were present."  (Ex. A to Dean Decl. at 8.)

the story, Luc more than fulfilled his obligation as the investigating officer.  See Cole v. City of Emeryville, No. C 08-02360, 2008 WL 4334694, at *5 (N.D. Cal. Sept. 22, 2008) ("Once probable cause is established, a police officer is not constitutionally required to 'investigate independently every claim of innocence.' ") (quoting Broam v. Brogan, 320 F.3d 1023, 1032 (9th Cir. 2003));  Pinckney, 2010 WL 94266, at *5 (officer had no duty to further interview accused after he denied the allegations against him); Nelson v. Inyo County Sheriff's Dep't, No. 06cv0107, 2007 WL 2711399, at *4 (E.D. Cal. Sept. 14, 2007) (explaining that "whether [the accused] was given 'equal opportunity' to explain himself [is] irrelevant to the probable cause determination").  Plaintiff was given the chance to provide a written statement but declined to do so.  (Murray Decl. ¶18.)[4]

In sum, when Officer Luc arrived on the scene, he spoke to Carpenter and was told that she had been choked and pushed up against a wall.  Her demeanor and visible injuries were consistent with her story.  Luc also listened to Plaintiff for half an hour, but did not receive a specific explanation for Carpenter's neck injury.  Based on Carpenter's detailed statement and the corroboration provided by her demeanor and visible injuries, Luc had probable cause to arrest Plaintiff for domestic violence.

## B. Qualified Immunity for Officer Luc

Even if Luc did not have probable cause to arrest Plaintiff for felony domestic violence, Luc would be entitled to qualified immunity.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Qualified immunity for peace officers is "an entitlement not to stand trial" and "an immunity

---

[4] To the extent Plaintiff complains that Defendants did not investigate crimes that Carpenter allegedly committed against him - i.e., theft, burglary, assault, trespass - Plaintiff's complaints have no bearing on whether probable cause existed to arrest him.

08cv2121 BTM(AJB)

1  from suit," and thus should be resolved "at the earliest possible stage in litigation," making

2  it an appropriate inquiry at the summary judgment stage.  Saucier v. Katz, 533 U.S. 194,

3  200-01 (2001) (internal quotation marks omitted).  Qualified immunity is a two prong inquiry,

4  and a showing that there either was no constitutional violation or that the violated right was

5  not clearly established will entitle officers to qualified immunity.  See Pearson, 129 S. Ct. at

6  818 (prongs of qualified immunity can be resolved in order that is most convenient).

7       In the present case, the Court finds that there was no constitutional violation because

8  Officer Luc had probable cause to arrest Plaintiff for domestic violence.  Even if there was

9  a violation, however, it would not have been of a clearly established right.  "Even absent

10  probable cause, qualified immunity is available if a reasonable police officer could have

11  believed that his or her conduct was lawful, in light of clearly established law and the

12  information the [officer] possessed."  Fuller v. M.G. Jewelry, 950 F.2d 1437, 1443 (9th Cir.

13  1991).  Put another way, qualified immunity protects "all but the plainly incompetent or those

14  who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).

15       Based on the information known to Luc and clearly established law such as Peng,

16  Luc's decision to arrest Plaintiff was objectively reasonable.  This is especially so given that

17  "domestic disputes present a responding officer with situations involving great potential

18  danger to occupants of the household.  If the officer hesitates to act, his hesitancy may lead

19  to the occurrence of otherwise preventable violence."  Peng, 335 F.3d at 977 (citations

20  omitted).

21

22  **C.  Monell Claims**

23       Plaintiff also seeks to impose liability on the City of Carlsbad on the theory of

24  municipal liability outlined in Monell v. Department of Social Services of City of New York,

25  436 U.S 658 (1978).  Under Monell, a municipality may be held liable under § 1983 only

26  where an "action pursuant to official municipal policy of some nature causes a constitutional

27  tort."  Monell, 436 U.S. at 691.  Municipal liability under Monell is established where "the

28  appropriate officer or entity promulgates a generally applicable statement of policy and the

subsequent act complained of is simply an implementation of that policy." <u>Bd. of County Comm'rs v. Brown</u>, 520 U.S. 397, 417 (1997).  Inadequate training can be the basis of <u>Monell</u> liability if it "reflects a 'deliberate' or 'conscious' choice by a municipality" not to avoid the risk of harm.  <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 389 (1989).

<u>Monell</u> liability cannot be imposed on the City in the absence of a constitutional violation by police officers.  <u>Dixon v. Wallowa County</u>, 336 F.3d 1013, 1021 (9th Cir. 2003). Because the Court holds that Luc had probable cause to arrest Plaintiff, there was no constitutional violation and thus no <u>Monell</u> liability.  But even if Plaintiff was falsely arrested in this case there would still be no <u>Monell</u> liability because Plaintiff has not shown that the arrest was made pursuant to an unconstitutional policy or inadequate training.

1. <u>Adequacy of Training</u>

Plaintiff alleges that due to inadequate training, Luc applied Policy 320's pro-arrest policy "too literally," and arrested Plaintiff without a full and complete investigation.[5] According to Plaintiff, the City failed to adequately train its officers with respect to responding to domestic violence calls.  However, Plaintiff's inadequate training claim is not supported by evidence.  According to Defendants, Carlsbad police officers were trained on the domestic violence policy with briefing training and CD training in the spring of 2008.  (Reno Dep. 23:1-24:25.) Plaintiff has not provided evidence that this training was inadequate in any way.

Plaintiff relies on the declaration of Jack Smith, a law enforcement professional, to establish inadequacies in the City's training regarding domestic violence arrests.  Smith notes that compared to the California Commission on Peace Officer Standards and Training, the Carlsbad domestic violence policy manual is "much shorter and appears to be less

_____

[5] Plaintiff does not actually challenge the constitutionality of Policy 320 itself.  The City's domestic violence policy is constitutional. The policy specifically authorizes arrest only when probable cause exists.  (Policy 320, Section 320.11(d).)  The policy is distinctly pro-arrest, but California courts have recognized that domestic violence presents an unusually dangerous situation for the victim, and that excessive deliberation and hesitation regarding arrests could jeopardize the victim's safety.  <u>See</u> <u>Peng</u>, 335 F.3d at 977.

comprehensive." (Smith Decl. ¶ 16.) However, the fact that the Peace Officer Standards and Training manual covers topics not covered by the Carlsbad domestic violence policy manual, does not mean that the topics were not included in other manuals or training materials.

Smith also discusses at length the types of evidence that could have possibly been present at a domestic violence crime scene (e.g., torn clothes, overturned furniture, offensive injuries, defensive wounds), but were not present at this scene. However, the lack of this evidence was consistent with Carpenter's account, which did not describe the sort of violent struggle that would necessarily result in overturned furniture, torn clothing, or offensive/defensive wounds. Furthermore, even if the officers erred in failing to investigate or consider certain evidence on this occasion, there is no evidence that such failure was due to a lack of training. See Harris, 489 U.S. at 391 ("[A]dequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.").

Plaintiff argues that Luc's lack of training was evident because Luc applied for an Emergency Protective Order on Carpenter's behalf even though she does not qualify for one. Even assuming that Luc's mistake can be blamed on lack of training, Plaintiff still fails to establish deliberate indifference on the part of the City. See Blankenhorn v. City of Orange, 485 F.3d 463, 484-85 (9th Cir. 2007) (explaining that "absent evidence of a program-wide inadequacy in training, any shortfall in a single officer's training can only be classified as negligence on the part of the municipal defendant," which does not rise to the deliberate indifference required for Monell liability) (internal quotation marks omitted).

2. Final Policymaking Authority

Plaintiff seeks to impose liability on the City under the alternate theory that Reno was a final policymaker who made the isolated decision to arrest Plaintiff without probable cause. According to Harper v. City of Los Angeles, 533 F.3d 1010, 1025 (9th Cir. 2008), a municipality can be exposed to liability for an isolated unconstitutional decision by a final

15

policy maker.  Plaintiff contends that Reno approved Plaintiff's arrest, and that Reno's approval constituted an isolated decision by a final policy maker to dispense with the probable cause requirement, exposing both Reno and the City to liability.  Lieutenant Reno was indeed the highest ranking officer on the scene and the Watch Commander.  However, there is no legal authority for the proposition that Watch Commanders have final policymaking authority for purposes of <u>Monell</u> liability.  <u>See</u> <u>Hale v. County of Los Angeles</u>, 2007 WL 2088699, at *1 (9th Cir. July 9, 2007).  Therefore, even if probable cause was lacking, the City cannot be held liable for an unconstitutional decision by Reno.

## IV.  CONCLUSION

For the reasons stated above, Defendants' motion for partial summary judgment is **GRANTED**.  The Court grants summary judgment for Defendants Luc, Reno, and the City of Carlsbad on Plaintiff's false arrest claim.

**IT IS SO ORDERED.**

DATED:  July 19, 2010

Honorable Barry Ted Moskowitz
United States District Judge